(No. 19064. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN B. REINER, Plaintiff in Error.

*Opinion filed February 21, 1930.*

EDWARD N. SHERBURNE, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (JOHN HOLMAN, and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

John B. Reiner was convicted in the criminal court of Cook county of an assault upon Jean Johnson with intent to commit a rape, and has sued out a writ of error to reverse the judgment.

The events which were the basis of the charge occurred in the afternoon of August 17, 1927, in the garage of the plaintiff in error, at 5031 Broadway, in Chicago. The front entrance to the garage was on Broadway near Argyle

street, and it extended back to an alley, where there was a rear entrance about thirty feet north of Argyle street. Across the alley from the garage was the elevated railroad, and several business places faced the alley, a cigar store, a jewelry store and a pool-room. Broadway and Argyle was a busy corner, where traffic was controlled by traffic signal until four o'clock in the afternoon, when a traffic officer went on duty. The only persons who testified to what occurred in the garage in the afternoon of August 17 were the prosecuting witness, the plaintiff in error and Jonas Wesby.

Jean Johnson testified that she is a married woman, the wife of Dr. D. W. Johnson, a chiropractor. On August 17, between twelve and one o'clock, she went into the garage from the entrance on Broadway to collect for an advertisement which she had previously received from Reiner. As there seemed to be nobody around the garage she walked back, and Reiner came from under a car on which he had apparently been working. When she told him she had come to collect for his advertisement he invited her into the office, saying he would give her a check. The office was at the back of the garage—"a sort of caged affair." A desk was next to the wall and back of it was a bench, on which she sat. Reiner took out a check book and she told him the amount due. He invited her to go to lunch with him and then to have a little drink with him, and she refused both invitations. He put his hand on her knee, and, as she started to get up, put his hands on her shoulders and forced her back on the bench. She screamed immediately, probably three or four times, and struggled with him for nearly a half hour, perhaps longer. He told her it would not do her a particle of good as the garage was almost a block long and he had discharged the colored boy. He bit her neck, leaving a mark which was there for at least three weeks, and bit her knee, drawing blood through the white dress she was wearing. She pleaded

with him to stop, but he did not let her go. She finally wrenched herself free and ran out of the garage. She had her purse still in her hands. Her clothes were soiled and greasy and her face dirty, and in that condition she ran to her home, at 4737 Malden avenue, not very far away, and called her husband at his office to come home.

Reiner testified that he went down-town at ten o'clock in the morning of August 17 and did not return until some time after dinner, when he found Mrs. Johnson and Ralph Storey in the garage and the colored boy whom he employed there. He had tried to get Storey to come to court as a witness at the trial and called him on the telephone, but he said he had to go away, as his company was sending him to Wisconsin. Storey was a salesman trying to sell a ticket machine to Reiner. Mrs. Johnson was standing there too. Reiner gave Storey an order for the machine and he went out. She then tried to collect the balance due her, but Reiner told her she was not going to get any money because the blotters for which she was trying to collect were in only a few rooms in the hotel and did Reiner no good. She said she was sorry—she had to have her money. Reiner was there by his desk and behind him were some seats. She sat down there and said, "Don't be so cross; I want to smoke a cigarette." She did smoke a cigarette. He did not grab hold of her, did not have his hands on her and did not touch her. At the time she left she said she would get him for this. These things occurred, Reiner testified, the same day Storey, the salesman, was at the garage and the same day Reiner bought the machine of him. Reiner got a sales slip for the machine and gave Storey a check for $25 on that day. Storey was not present at the trial. Neither the sales slip for the sale of the machine nor the canceled check for $25 was produced.

Mrs. Johnson was called as a witness in rebuttal and was the last witness called on the trial. In her testimony

in chief she gave an account of the beginning of her acquaintance with Reiner and of her solicitation of the advertisement from him, for which he was to pay $17.50 and for which he had given her a check for $10 on the tenth of August. After Wesby and Reiner had testified in chief to Storey's presence in the garage on August 17, Mrs. Johnson in rebuttal testified that she never smoked a cigarette in the office with Reiner on the day that Storey, the salesman, was there with the ticket machine; that it was around lunch time, and a negro man said Reiner probably would not be back for some time and probably they had better go to lunch. Storey said that he was going up the street and would show her where there was a good restaurant. She had lunch with him at the same restaurant and paid for her own lunch. He sat at the same table with her and they returned to the garage. He showed the ticket machine to Reiner and she saw Reiner accept it. A receipt was made out on the register form, which may have been the receipt for the machine. She did not see Reiner pay him any money at that time. That was about August 17, the same day that Storey was there. She never knew Storey before he introduced himself to her while she was standing there.

Jonas Wesby, whom Reiner employed in the garage, testified that he was a general mechanic employed by Reiner working in the garage, cleaning cars and taking care of customers. He knew Mrs. Johnson and saw her around the garage three, four or five times. He saw her on August 17. She came to the garage about ten o'clock in the morning. A salesman named Storey was also there waiting to sell some kind of a machine to keep in the garage. Reiner was not there and they waited for him until about noon. Mrs. Johnson had some kind of a package which she wanted to leave with Reiner and she wanted to see him. She and Storey were talking together but Wesby did not hear what they said. They went out together and

each left a package with Wesby. They were gone an hour and a half or two hours and came back together about 1:30. Reiner had come in and he was going to wait on them. Mrs. Johnson said he should wait on Storey first because she was not in such a hurry, and Reiner did so. This took place in the front part of the garage and later on they walked to the back. After Storey had gone out Mrs. Johnson and Reiner went into the office and stayed there about twenty minutes. There was no screaming. Mrs. Johnson was smoking a cigarette and sitting down, talking to Reiner. After they were there a while they walked down together through the garage side by side, stopped right in the center of the door and were standing there, talking, about twenty minutes, when she went away and Reiner came back and went to work. Wesby was there all the time Mrs. Johnson was. He went home about 2:00 o'clock or 2:30 that afternoon because he was changing from day work to night work that day. He went home to sleep and came about ten o'clock that night and went to work. The garage was about full of cars that day, people coming for their cars and coming in to buy gas. All the doors and windows in the garage were open and there were people in the cigar store in the alley. Wesby saw Reiner give Mrs. Johnson a check or money that day but was not sure which it was.

This was all the direct evidence in regard to the occurrence. It is not entirely convincing of the assault by the defendant or the intent charged in the indictment. Giving full credit to the testimony of the prosecuting witness it shows an indecent assault upon her, but when considered in connection with the time, the place and the circumstances it lacks somewhat of the satisfactory proof of the intent which the law requires. The time was in the early part of the afternoon, in daylight, and the room was a public garage into which people might be expected to come at any time, and the place where the assault is charged to

122

have occurred was open to the observation of anybody in the garage. It was near the entrance on the alley, where people might be expected to be constantly present and passing. The action of the defendant is not shown to have been of such excessive violence as to indicate the intention of the assailant, required in cases of this character, to gratify his desire at all hazards and over any resistance which may be offered. However rude and unseemly may be the acts of a person charged with this offense, they are not sufficient to justify a conviction unless they go to the extent of showing, beyond a reasonable doubt, an intention to overcome every resistance. The bite on the knee and the bite on the neck did not indicate such excessive violence of the defendant as to constitute proof of the intent charged, and her struggle was not so violent but that when she finally wrenched herself loose she still had her purse in her hand. Disregarding the testimony of the defendant, who denies every statement of the prosecuting witness tending to sustain the charge against him, the testimony of the worker who was employed in the garage is entirely inconsistent with the commission of the acts testified to by Mrs. Johnson. If the testimony of this witness is entitled to credit, he was present in the garage only a few feet from the office in which the events testified to by Mrs. Johnson were said by her to have occurred and in full view of the office and its occupants. The events could not have occurred without attracting his attention both by the struggle and the screams with which it was attended. It seems unlikely that her screams during the half hour of her struggle would not have attracted the attention of persons in the alley.

Mrs. Johnson testified that after her escape from the defendant and return to her home she went back to the garage about a half hour later with her husband. Reiner was still working on the same car. He came out from under the car and Dr. Johnson asked if he was Mr. Reiner.

Reiner said that he was, and Johnson asked him if he knew the lady in here. Reiner said, "Yes, I owe her some money." Johnson said, "Yes, I know you owe her some money, but that is not what we came here for. When did you see Mrs. Johnson last?" Reiner said, "She was here just a little while ago, to collect the money." Johnson said, "Well, while she was here, did she or did she not act as a lady?" The reply was, "Yes, she did." Johnson then asked, "What gave you the right to attack her—to leave these bruises on her body?" Reiner said, "Oh, I was just playing a little with her. Perhaps I can explain this to you, being a man yourself." Johnson's reply was, "No, you can't explain that, that you were just playing, because her body is bruised. Did you or did you not attack her?" The answer was, "Yes, I did. Don't have me arrested. I will pay you anything that you want. I will give you any amount of money." Johnson struck Reiner and said, "Do you think money will satisfy us?" and Reiner said, "All right, then; I will get my gun," and he went into the screened cage and locked himself in and snatched his gun. Then Mrs. Johnson and her husband went out. They had previously been looking for an officer and then they located officer Gall and brought him in. The officer did not arrest Reiner but tried to get him to get someone to look after the garage while he took him to the station. Mrs. Johnson then went to the town hall station to make complaint against Reiner. She signed two complaints. The person who made out the warrant was writing, and she did not know anything about that and there was a mistake made. The one he wrote was for disorderly conduct and the following day she made the second complaint— to the best of her knowledge a matter of a day or two.

Dr. Johnson testified that he and Mrs. Johnson went to the garage about 2:30. Reiner was working under a car and Johnson called him out and asked him if his name was Reiner. He said it was, and Johnson asked him if he

ever saw this lady before. He said yes, he had had some business dealings with her. Johnson asked him if she had ever conducted herself other than a lady would, and he said no. Johnson asked him to give an account of his conduct, and he said, "That wasn't anything; that he had always liked her." Johnson told him that he was Mrs. Johnson's husband, and he said that that did not make any difference; he was just playing; that was all. Johnson asked him what he meant by "playing;" if he thought he could treat a respectable woman that way; and he said, "Well, you are a man and I can explain." Johnson said, "No, you can't explain this act," and he said, "We will not have any trouble about this." Johnson said, "As far as trouble is concerned, I am going to have you arrested." He said, "Don't have me arrested; I will pay you anything." Johnson said, "No, you won't." Reiner said that there wasn't any reason for Johnson to feel that way about it, and Johnson struck him. Reiner ran into the little caged office and grabbed his shot-gun and said he was going to shoot Johnson. Johnson and his wife then went out on the street and summoned the officer, Gall. They then went back with Gall to the garage and told him what had happened. The officer was to arrest him, but Reiner could not find anybody to stay in the garage in his place because he had discharged the colored man. He telephoned, trying to get the colored man to stay in the garage while he went to the station. The officer said for them to come down to the town hall station and swear out a warrant, and they left and went to the town hall and swore out a warrant. Johnson said that when they left to get officer Gall on the corner he told the officer they wanted him to go over there and throw a scare into Reiner just because his wife did not want the thing to come into court. It was not because they wanted money—they were offered money.

Officer Gall testified that he had been a member of the police force for seven years and on August 17 saw Mrs.

Johnson at Argyle and Broadway, a little bit south of the garage. She showed him a mark of a kind of blue color on the right side of the ear, between a nickel and a quarter in size. He went with her to the garage and saw Reiner there, but did not place him under arrest for the reason that he understood that Mr. and Mrs. Johnson simply wanted him to go and talk to the man and throw a scare into him. Mrs. Johnson said she did not want to come to court, and so she said he should just go in and throw a scare into him. He told Reiner that he was going to take him in, and Reiner said, "All right," and tried to call up two or three people but could not get the man or anybody to take care of the garage, so Gall told Mr. and Mrs. Johnson that he would be taken care of. Argyle and Broadway, about noon, is a very busy corner. There are stop lights there but no officer in control of traffic until four o'clock. Gall had come on at four o'clock and had just reported for duty.

Concerning what occurred when Mrs. Johnson returned with her husband, Reiner testified that Dr. and Mrs. Johnson came into the garage and Reiner said, "What is the matter?" Dr. Johnson said he would find out soon what was the matter and that this was going to cost him a lot of money—he would either pay or go to Joliet. Reiner asked him for what, and Johnson said for insulting his wife. Reiner said nobody insulted his wife that he knew; that if he thought there was anything wrong he could see the judge. Johnson said he had a policeman right there to have Reiner arrested, and Reiner told him to go ahead and arrest him, and then Johnson struck him in the face and Reiner walked away and then they went away. Reiner went into the rear shop and continued his work. Afterward they came back with the officer. Mrs. Johnson said, "Look out! He is going to shoot you!" Reiner was working on a motor in another car, and the officer said, "No, he won't; if any shooting is to be done I will do the shoot-

ing." He said, "You will have to come along," and Reiner said, "All right." Reiner tried to get the colored boy but could not get him, and finally they went away. He was arrested about a week after that. Reiner denied that he got a gun that day or that he had a gun at the garage.

The testimony in regard to what took place after Mrs. Johnson left the garage and called her husband does not add to the strength of the case against Reiner made by the evidence of Mrs. Johnson, Reiner and Wesby as to what occurred in the garage—rather it tends to weaken the case. The action of Dr. and Mrs. Johnson in going back to the garage to confront the defendant indicates that Mrs. Johnson made complaint to her husband about her treatment by the defendant. It has no tendency to strengthen the case made against him by her testimony in chief. While her testimony and her husband's tends to show implied admissions by Reiner of improper conduct requiring explanation, there is no mention in the testimony of any of the witnesses to what occurred at that time of an admission of any specific act or purpose or of any fact tending to show Reiner's guilt of the crime for which he was later indicted. When Johnson and Mrs. Johnson went out of the garage they told officer Gall that they wanted him to go over and throw a scare into Reiner just because she did not want this thing to come into court. According to Mrs. Johnson's testimony the warrant first issued was for disorderly conduct. She said that a mistake was made, and before she made the second complaint she consulted with a friend of her husband's, an assistant State's attorney, and he advised her to complain against Reiner for an assault to commit rape, and she did so.

The facts testified to by Mrs. Johnson would have justified a warrant for disorderly conduct or for an assault or for an assault and battery. If they were accompanied with the intent to compel the prosecutrix to yield to his wishes and force a compliance with his desires regardless

of any resistance she might make, then they must have known that he was guilty of an assault to commit rape, and their request to the officer merely to go over and throw a scare into Reiner is hardly consistent with the charge made later that he was guilty of the offense with which he was charged in the indictment.

"The proof of a mere assault and battery, however aggravated it may be, without the intent to rape, will not warrant a conviction of assault with intent to rape, nor will the proof of mere licentious conduct, or even violent familiarity, with the female in an effort to induce her to yield to the embraces of the assailant, where there is no proof that he intended to have carnal knowledge of her by force and against her will. The specific intent charged is the gist of the offense." (*People* v. *Cieslak,* 319 Ill. 221.) While the jury are the judges of the facts and the weight of the evidence in criminal cases, yet it is the duty of the court to review the evidence carefully, and where the conviction is based upon unsatisfactory evidence, or where, after a consideration of all of it, there remains a doubt of the guilt of the accused so grave as to lead to the conclusion that the verdict of the jury is not that which a calm and deliberate consideration of the evidence requires, then it is the duty of the court to set it aside. It was not apparent until Mrs. Johnson had testified that the testimony of Storey and evidence of the date of the sale of the ticket machine and the payment to him would be important. The trial was short, and as Storey was in Wisconsin his testimony could not then be obtained. On another trial this evidence may be available.

In view of the whole record we are satisfied that the evidence does not exclude all reasonable doubt of the defendant's guilt and that the ends of justice require the submission of the cause to another jury.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*