(No. 35289.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES RICHARDSON, Plaintiff in Error.

*Opinion filed January 22, 1960.*

McCoy, Ming & Leighton, of Chicago, (William R. Ming, Jr., and George N. Leighton, of counsel.) for plaintiff in error.

Grenville Beardsley, Attorney General, of Springfield, and Benjamin S. Adamowski, State's Attorney, of Chicago, (Fred G. Leach, Assistant Attorney General, and Francis X. Riley, and William W. Winterhoff, Assistant State's Attorneys, of counsel,) for the People.

Mr. Chief Justice House delivered the opinion of the court:

Defendant, James Richardson, has brought a writ of error to this court to review his conviction in the criminal court of Cook County for the crime of assault with intent to commit rape.

Defendant, a licensed medical doctor, is an eye, ear, nose and throat specialist and a senior attending physician at the Provident Hospital in Chicago. He maintains a suite of offices on the second floor of a medical center building at 3233 South Park, Chicago, in which there are ten other doctors, all of whom have suites constructed to meet the requirements of their specialty.

The complaining witness is a graduate nurse at the Provident Hospital. During the course of her nurses training she had come to know the doctor casually and on Sunday afternoon, November 17, 1957, she asked the defendant, who was at the hospital at that time, to examine her for an earache. After a brief examination, arrangements were made for further treatments at his office. On Monday,

she went to his office, received further treatments and made another appointment. On Thursday evening, November 21, 1957, she prevailed upon a classmate, one John Aaron, a male student nurse, to drive her to the doctor's office and wait for her while she was being treated. She registered with the receptionist at about 5:40 P.M., waited about an hour to see the doctor, then received an examination and treatment lasting approximately 45 minutes. The doctor then told her that if she would wait until he finished with some other patients, he would give her an audiogram test, which she agreed to do. About 9:00 P.M., when the last of the patients had been dismissed, she and the doctor were the only persons left in his offices.

The defendant's version of the affair was that the prosecutrix had made suggestive advances toward him during the two previous visits to his office. He stated that when he was showing her the audiogram machine at the conclusion of the last examination she again made a suggestive maneuver towards him and as she started to leave he grabbed her around the waist, kissed her several times and that she responded. He interrupted his attentions to record the results of the audiogram, then took her on a tour of his offices after which he resumed his kissing and fondling. She became ardent and he began attempts to raise her skirt. When he experienced difficulty unbuttoning her skirt he said that she assisted him to find a hidden button. After indulging in more kisses he excused himself to go across the hall to a toilet and when he returned they kissed some more and again she was responsive. This situation, according to the defendant, continued for several minutes during which time he made further attempts to pull up her slip but when he learned she would not concede voluntarily he tired of the effort, assisted her into her clothing and asked her to leave. He then went downstairs to the reception room to see if her companion was still there and on returning handed her coat to her and she left his office. About

10:00 P.M. he went to a lounge room across the hall from his offices where other doctors were gathering to attend a building management meeting previously arranged for that night and after stepping out for a sandwich he returned to attend this meeting. His presence was confirmed by two doctors who also attended the meeting.

The complaining witness testified that after the other patients had left the office, the doctor took her on a tour of the other rooms showing and explaining some of the equipment used in his practice. She was then taken into a sound-proofed room where she was given an audiogram examination lasting about 45 minutes. When this examination was concluded, she asked for her coat and he then ask her, "What's the rush?" He then grabbed her about the waist, held her face with his other hand and began kissing her. She stated that she resisted but because of his size and strength she was unable to free herself, that he pulled off her skirt, pulled her over to a couch in the adjoining room where he exposed himself and made repeated attempts to pull her panties down. She said that once she broke away but when she could not get the door open he grabbed her and again pulled her back to the couch and repeated his attempts to have sexual intercourse with her, and that during this time she was crying and struggling to prevent him from pulling her panties down.

During the struggle he told her to be quiet and not be so contrary but when she told him that she would tell everybody she knew if he forced himself on her, he discontinued his efforts and asked her to get dressed and leave by the back door. When she refused he went downstairs to see if Aaron was still there and she waited in his office for him to return so that she could get her coat which he had taken from her. After getting her coat she ran downstairs crying and was driven back to the hospital by Aaron.

Aaron testified that when she came down the stairs he noted that she was crying and disheveled and so emotionally

upset she did not immediately tell him what happened. When they had returned to his automobile she then reported that the doctor had tried to force a relationship upon her. He drove her to the hospital where they were joined by their friend, Arthur Goode, also a student nurse, and the three of them sat in Aaron's car for a short time talking about the incident. After having coffee at a drive-in restaurant, he drove her to the nurses' quarters where she reported the incident to her superior and to the police. It was about 1:15 A.M. when she reported to the hospital emergency room where she was examined by an intern who said she was crying and nervous, that he examined her body and noted nothing unusual about it, and prescribed a sedative.

Thus, we find ourselves faced with a situation where the defendant admits the assault but contends that the evidence fails to prove that he intended to have intercourse with prosecutrix by force and against her will. It is elementary that the crime of assault with intent to commit rape requires proof beyond a reasonable doubt of an unlawful assault upon the prosecuting witness with intent, feloniously and forcibly, to ravish and carnally know her against her will. *People* v. *Reiner,* 338 Ill. 117; *Newman* v. *People,* 223 Ill. 324; *Stevens* v. *People,* 158 Ill. 111; *Barr* v. *People,* 113 Ill. 471.

There are factors militating against proof of the element of specific intent. The prosecutrix failed to scream or cry out for help when she was first grabbed and kissed, when being disrobed or pulled over to the couch. We are cognizant of the probability that an outcry would have been ineffective but cannot discount her failure to do so. There is the matter of her clothing which was not damaged other than an alleged tear in her stockings which, at a preliminary hearing, she had reported as a run. There is the lack of marks or bruises on her body, indicating an absence of the degree of force and violence so prevalent in cases of

334

this type and which might reasonably be expected if a 96-pound female strenuously resisted the efforts of a six-foot, 190-pound man bent on rape. There is the uncontroverted testimony that he voluntarily desisted merely upon her threat to tell and that he offered to help her put her skirt back on. Finally, we cannot discount the lack of fear she exhibited by waiting for the doctor to return to the offices after going downstairs to check on her companion.

We conclude that the evidence was not sufficient to support the finding of guilty and it is unnecessary therefore to consider the other assignments of error. The judgment of the criminal court of Cook County is reversed.

*Judgment reversed.*